GLENN E. BOTSCH ET AL., APPELLEES, V.
LEIGH LAND COMPANY, A NEBRASKA CORPORATION,
ET AL., APPELLANTS.

313 N.W.2d 696

Filed December 28, 1981. No. 44021.

Raymond E. Baker and David A. Beck of Baker & Beck, P.C., for appellants.

William A. Wieland of Healey, Brown, Wieland, Kluender, McCord & Atwood for appellees.

Heard before BOSLAUGH, McCOWN, CLINTON, and BRODKEY, JJ., and STANLEY, District Judge.

McCOWN, J.

The defendants appeal from an order denying defendants' motion and application for vacation of an injunction enjoining them from operating a feedlot designated as the Leigh Land Company feedlot "in any manner until and unless they can demonstrate, upon proper application and showing, that the same can be done without injury and harm to the plaintiffs as it now exists."

This is the third appearance of this matter in this court. In the first case, which appears at 195 Neb. 509, 239 N.W.2d 481 (1976), under the same title, the background facts are set forth in detail. The trial court in the first case sustained defendants' motion to dismiss plaintiffs' petition at the close of plaintiffs' case on the theory that as a matter of law a nuisance did not exist. This court found that the trial court was in error and reversed and remanded for further proceedings.

In the second case, which appears at 205 Neb. 401, 288 N.W.2d 31 (1980), again under the same title, the plaintiffs' evidence was submitted to the trial court on the bill of exceptions from the first case. The trial court restricted the evidence to the years 1969 to 1974. The defendants did not present evidence to demonstrate how the nuisance-creating factors of feedlot operations shown by the record could be dispensed with. So far as the evidence in this court indicated, however, there had been no change in the operation of the feedlot

since the first case, except that the ponds had been partially drained. The trial court found there was a nuisance, and entered a mandatory injunction requiring the defendants to drain the four waste disposal ponds and prohibiting them from ever using the ponds to hold any "mix of cattle manure and water," and awarded plaintiffs a judgment for $4,800 damages to date of trial. The plaintiffs again appealed. On appeal this court found that the record clearly established that the defendants' feeding operations, conducted and operated as shown by the evidence in the first case and introduced in the second case, constituted a nuisance, and the defendants' failure to introduce evidence that the nuisance-creating factors had been or could be dispensed with by any other means made it necessary to enjoin the conduct of the feedlot enterprise rather than to enjoin only the maintenance of the ponds. Accordingly, this court directed the trial court to enter an order enjoining the defendants "from operating the feedlot in any manner until and unless they can demonstrate, upon proper application and showing, that the same can be done without injury and harm to the plaintiffs as it now exists." The judgment for damages was affirmed. Upon remand the trial court entered the permanent injunction as directed by this court.

Thereafter, the defendants filed their application for an evidentiary hearing and motion for temporary and permanent vacation of the injunction. The third trial followed, and the defendants have appealed from the order of the District Court denying defendants' motion and application for vacation of the injunction.

The evidence shows that there were four waste disposal lagoons across the road to the south of the plaintiffs' residence and that the most objectionable odors referred to in the first case emanated from these lagoons. They are the lagoons or ponds referred to in the trial court's injunction in the second case. The evidence in the case now before us shows that in June of 1977 three of the four lagoons were removed, the

area leveled and graded, and that area, together with a portion of the north part of defendants' feedlot, was converted from feedlot use to pasture. The fourth lagoon farthest away from the plaintiffs' residence was converted into a debris basin and a terrace installed so that drainage from the north portion of defendants' feedlot and the adjacent Folken feedlots to the east would flow around a hill to the south or backside of a hill away from the plaintiffs' residence into the debris basin. A perforated tube was installed in the debris basin to permit the water to drain out of the debris basin in a regular flow and into a drainway which carried it away. These changes provided an additional 382 feet of spacing between the south right-of-way line of the road south of plaintiffs' residence to the closest area of defendants' feedlot. The reconstruction was done under the supervision of the Department of Environmental Control, and when it was completed the livestock waste control facility for the defendants' feedlot and the Folken lots to the east was approved and certified by the department in the summer of 1977.

The evidence also shows that thereafter manure was scraped up and bladed periodically and put into mounds. In the spring of each year mounding was done, using heavy equipment, and a mixture of dirt and manure was scraped and mounded. Mounding was also done in the fall as well. Periodically, the lots were scraped and bladed and manure was pulled up into the mound and smoothed and the lots leveled so they would drain properly.

Prior to the cattle being removed in April of 1980 after the entry of the injunction by the trial court on the mandate of this court in the second case, the lots had been scraped and leveled on five occasions that year. The Folken lots immediately to the east were maintained and operated in the same fashion. Several witnesses who had testified to the strong odors that were present at the time of the first trial testified that after the changes had been made, they no longer noticed

odors coming from the lots when they drove by on the road south of plaintiffs' house.

The defendants called a number of expert witnesses who had examined the defendants' feedlots and the Folken feedlots immediately to the east at a time shortly prior to the trial in this case. Dr. Miner, whose background training and experience was in odor control work related to livestock production, testified that in the area of the former ponds he found no indication of sufficient organic matter to support odor production, even if saturated, and that on the date of his inspection when the debris basin was actually draining water, no odor was perceptible from it until he was within 10 feet of it. It should be noted here that the debris basin is used for the Folken lots to the east as well as for the defendants' lot, and that at the time of trial the Folken lots had approximately 1,000 cattle but had contained as many as 1,200 cattle within a few months prior to trial. Dr. Miner testified that the manure management aspects and the surface water management of the defendants' lot and the adjacent Folken lots were of high quality, designed and managed in such a way as to produce a minimal quantity of odor for a cattle feedlot surface. In his opinion, taking into account the prevailing winds, plaintiffs would be able to detect feedlot odor at a perceptible level at their residence approximately 15 percent of the time.

Dr. Campbell, a research entomologist and an expert in the study and control of feedlot flies, also examined the defendants' and the Folken feedlots. He examined the cattle in the Folken lots and found very few flies on the cattle and no indications of the presence of stable flies. He examined the area of the former holding ponds, the debris basin, the mounds, and the lots for fly breeding areas and found very few. Dr. Campbell testified that, in his opinion, the defendants' feedlot would not tend to create a fly problem for the plaintiffs at their location of a kind and nature greater

or different than experienced by other rural residents.

Dr. Guyer, a livestock specialist who had worked in the area of feedlot production for 26 years, testified that with proper management as being practiced by the defendants fly problems should be no worse for the plaintiffs than it would be around the average farm home.

The various experts generally agreed that at the distance of 382 feet from the south right-of-way of the road to the nearest feedlot of the defendants, they would anticipate that normal traffic on the rural road would cause dust more frequently than the feedlot, and that feedlot dust is seldom a problem in the eastern two-thirds of Nebraska, based upon climatological conditions, and that dust problems, if they occur, would be limited to a dry period in August or September.

Plaintiffs conceded that the structural changes made in 1977 had improved the situation but testified that there were still some flies, odors, and dust. Plaintiffs did not introduce any expert testimony to contradict the testimony of defendants' expert witnesses.

At the conclusion of the trial the District Court found that the odors and the number of flies reflected in the evidence at the first trial would be greatly reduced by the changes which had been made by defendants but that there would be no significant reduction in dust emanating from the feedlot in future operations. The court also found that there will be odors, flies, and dust in any feedyard but that the effect of Nebraska case law is to zone the country and that the location of defendants' feedyard is in an area where smells, dust, and flies are prohibited. The District Court therefore denied defendants' motion and application for a vacation of the injunction.

In essence, the plaintiffs take the position that under the order entered at the direction of this court in the second case, the injunction cannot be vacated or modified until the defendants prove that the feedlot can be operated without odors, flies, and dust. We disagree.

There can be no doubt that the manner in which the defendants were conducting their feedlot operation at the time of the first trial had made plaintiffs' premises virtually uninhabitable and constituted a nuisance.

In the second case plaintiffs' evidence was the bill of exceptions from the first trial, and the court restricted the evidence to the years 1969 to 1974. The evidence therefore indicated that there had been no change in the physical location of the lagoons or of the defendants' feedlot, and no change in the method of operation of the feedlot since the first trial. The defendants did not present any evidence and there was, therefore, no showing that the "nuisance-creating factors" could be dispensed with by any "other means." This court therefore directed the trial court to enter an order enjoining the feeding business. Our opinion was directed at the defendants' feeding operations as shown by the evidence at the first trial and reintroduced at the second trial, and our reference to the situation "as it now exists" in the second case related to the operations shown by that evidence.

The evidence in the third case, which is now before us, establishes that in actuality the situation at the time of the second trial was not the same as it was at the time of the first trial but had been substantially changed. Those changes were not in the record before this court until now.

The evidence in the present case shows that three of the four lagoons which were found to be the principal nuisance-creating factors in the first case have been completely removed, leveled, and the areas planted to pasture. The fourth lagoon was rebuilt into a debris basin with a discharge tube installed. A portion of the north part of defendants' feedlot adjacent to the road south of plaintiffs' residence has been converted from feedlot usage to pasture and the closest area of the defendants' feedlot is now 382 feet south of the south right-of-way line of the road.

The testimony of expert witnesses generally indicates that at its present location and under proper methods of

operation of defendants' feedlot, flies, odor, and dust conditions at plaintiffs' residence will not be substantially different than conditions normally found elsewhere in the area. That expert testimony stands uncontradicted.

A court of equity will not usually enjoin the operation of a lawful business without regard to how serious may be the grievance caused thereby. In the first instance, at least, it will require the cause of the grievance to be corrected and it will enjoin the conduct of the enterprise perpetually after it has been proved that no application of endeavor, science, or skill can effect a remedy or that the owners cannot be induced to conduct it properly. *Botsch v. Leigh Land Co.*, 195 Neb. 509, 239 N.W.2d 481 (1976); *Botsch v. Leigh Land Co.*, 205 Neb. 401, 288 N.W.2d 31 (1980).

The evidence in this case is now convincing that the principal causes of plaintiffs' grievance have been corrected and there is no longer justification for the continuing injunction against the operation of the feedlot enterprise. We therefore direct the District Court to vacate and remove the present injunction.

To maintain the situation now shown in the record, the defendants should be enjoined from placing or maintaining any lagoon, pond, or feedlot closer than 382 feet south of the south right-of-way line of the road south of plaintiffs' residence. The District Court is directed to enter such an order.

The judgment of the District Court is reversed and the cause is remanded with directions.

REVERSED AND REMANDED WITH DIRECTIONS.